THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
Assigned on Briefs February 18, 2021

## MARCUS THOMAS v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Knox County**
**No. 108073    G. Scott Green, Judge**

_____

### No. E2020-00751-CCA-R3-PC

_____

The Petitioner, Marcus Thomas, appeals from the Knox County Criminal Court's dismissal of his petition for post-conviction relief from his guilty pleaded conviction to attempted first degree murder. On appeal, the Petitioner contends that the post-conviction court erred by dismissing his petition and denying relief on his claims alleging that his guilty plea was involuntary and unknowing and that he received the ineffective assistance of trial counsel. We affirm in part and reverse in part the post-conviction court's judgment and remand the case for further proceedings.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed in Part; Reversed in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT L. HOLLOWAY, JR., JJ., joined.

Joseph Liddell Kirk (on appeal) and Joshua D. Hedrick (at post-conviction hearing), Knoxville, Tennessee, for the appellant, Marcus Thomas.

Herbert H. Slatery III, Attorney General and Reporter; Renee W. Turner, Senior Assistant Attorney General; Charme P. Allen, District Attorney General; Leslie Nassios, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

On November 2, 2015, the Petitioner pleaded guilty to an attempted first degree murder, during which the victim suffered serious bodily injury. The Petitioner's indictment did not include the "serious bodily injury" sentencing enhancement; however, the Petitioner's pleading guilty to the enhancement was a term of his plea agreement. *See*

T.C.A. § 40-35-501(k)(5) (supp. 2013) (subsequently amended). The Petitioner received a sentence of twenty years at 100 percent.

At the plea colloquy, the trial court asked the Petitioner if the Petitioner understood that he was agreeing to plead guilty to a sentencing enhancement that was not specified in the indictment. The Petitioner said that he understood this was a term of his plea agreement with the State. The prosecutor stated that had the Petitioner's case proceeded to trial, the State would have presented the following evidence: The victim ended her romantic relationship with the Petitioner, and, a short time later, the Petitioner went to the victim's home armed with a gun. The Petitioner struck the victim on her head with the gun and strangled the victim until she was unconscious. As the victim regained consciousness, the Petitioner repeatedly kicked the victim, causing injuries to her face. The Petitioner fired the gun at the victim, but the gun "jammed," and the bullets did not strike her. At some point during the assault, the Petitioner's father and brother arrived at the victim's home and attempted to restrain the Petitioner. The Petitioner broke free and took a pocketknife from his brother. The Petitioner cut the victim's ear and stabbed her in the left breast and the left side of her chest. During the assault, the Petitioner threatened to kill the victim, the victim's son, and then himself.

The Petitioner acknowledged that had his case proceeded to trial, he faced a potential sentence range of between 40 and 60 years. The Petitioner said that he understood he was agreeing to a twenty-year sentence to be served at 100 percent. The Petitioner said that he understood that additional counts in the indictment were being dismissed in exchange for his guilty plea. The Petitioner testified that he understood the guilty plea proceedings, that no one had forced or pressured him to plead guilty, and that no one had made any promises to him other than the terms of the plea agreement. The Petitioner identified his signed waiver of a jury trial and request for acceptance of a guilty plea form. The Petitioner stated that he understood he was waiving constitutional rights, including his right to a jury trial, his right to confront witnesses, and his right not to incriminate himself. The Petitioner said that he was satisfied with trial counsel's representation. The Petitioner said that he understood he was waiving his right to appeal his conviction. The court found that the Petitioner knowingly and voluntarily waived his rights and accepted the Petitioner's guilty plea.

The Petitioner filed a pro se petition for post-conviction relief. Appointed counsel filed an amended petition, and a post-conviction hearing was held on October 16, 2019. The Petitioner alleged that he received the ineffective assistance of counsel and that his plea was not knowing and voluntary. Specifically, the Petitioner argued that trial counsel did not advise the Petitioner about the sentencing enhancement for inflicting serious bodily injury, that counsel did not advise the Petitioner as to how an expert's testimony could have mitigated the Petitioner's culpability for attempted first degree murder, and that counsel

promised the Petitioner specific medical treatment in exchange for the Petitioner's guilty plea.

At the post-conviction hearing, the Petitioner testified that at the time the offense occurred, the Petitioner was taking anabolic steroids because he was a professional body builder. He said that steroids created "growth" and gave him a competitive edge in pursuit of his professional body building career. The Petitioner said that he became a "user" and that the steroids caused physical and mental side effects. The Petitioner said that he saw Dr. Edward Kim, a urologist, to deal with issues caused by the steroid use. The Petitioner explained that he saw Dr. Kim for "dystrophy in the testicular area," which caused the Petitioner constant pain and difficulty in "trying to conceive." The Petitioner said that Dr. Kim discussed with him the mental side effects caused by the Petitioner's steroid use. The Petitioner said the medical staff at the detention facility treated him for testicular pain and determined that he was depressed and suicidal as a result of side effects caused by ceasing his steroid use.

The Petitioner testified that he had a history of mental illness. He said that he had been admitted as a patient at Baptist Hospital, Lakeshore, and Peninsula. The Petitioner said that Dr. Gillespie treated and diagnosed the Petitioner in 1999. The Petitioner said that he discussed his use of steroids and his history of mental illness with trial counsel. The Petitioner said that he told counsel that the steroid use had affected his "mental judgment" and that counsel could consult the Petitioner's lead mental health provider if counsel decided to obtain the Petitioner's records. The Petitioner said that counsel spoke to Dr. Kim and that Dr. Kim assessed the Petitioner after the Petitioner's arrest. The Petitioner said Dr. Kim issued a report regarding the Petitioner's health. The Petitioner said that Dr. Kim's conclusion that the Petitioner suffered from "steroid psychosis" was consistent with how the Petitioner's perceived steroid use had affected him.

The Petitioner testified that had his case gone to trial, Dr. Kim would have testified regarding the Petitioner's diagnosis of steroid psychosis and how steroid psychosis might have affected the Petitioner's mental health and decision-making ability during the offense. The Petitioner said that he received mental health treatment from Dr. Clifton Tennison and Mike Maurs at the detention facility. The Petitioner said that he experienced insomnia, high blood pressure, anxiety, scrotum testicular pain, and difficulty breathing. The Petitioner said that before his incarceration, Dr. Kim had performed surgery on the Petitioner's genital area and that after his incarceration, the Petitioner suffered complications related to the surgery. The Petitioner said that he needed additional treatment related to the surgery but that he did not receive the necessary medical care while incarcerated. The Petitioner said that as a result of his not receiving medical care, he felt hopeless and suffered from a "testicular mass." The Petitioner said that he discussed these problems with trial counsel before his guilty plea. The Petitioner said that counsel

requested the Petitioner receive a medical examination while he was incarcerated awaiting trial.

The Petitioner testified that he had expected his case to proceed to a jury trial until shortly before he decided to plead guilty. The Petitioner stated that trial counsel initially had been confident that Dr. Kim's findings would be helpful to the defense at the trial, but that two days before the trial date, counsel told the Petitioner that he was unsure whether Dr. Kim would be permitted to offer expert testimony regarding the Petitioner's mental capacity on the day of the offense. The Petitioner said counsel's recommendation was that it was in the Petitioner's best interest to enter into a guilty plea agreement with the State. The Petitioner said that counsel explained to him the terms of the plea offer and promised the Petitioner he would receive medical treatment for his steroid abuse as a condition of his guilty plea. The Petitioner explained that he would not have pleaded guilty but for counsel's promise that the Petitioner would receive specific medical treatment. The Petitioner said that after he pleaded guilty, he sought medical treatment from the Tennessee Department of Correction (TDOC). The Petitioner said that he was informed by the TDOC medical staff that neither the courts nor his counsel had the authority to determine what type of medical care the Petitioner would receive after he entered TDOC custody. The Petitioner said that he did not receive the promised medical care and that his symptoms persisted. The Petitioner explained that he had high blood pressure, breathing problems, and an inguinal hernia. The Petitioner said that his testicular problems had increased since entering TDOC custody. The Petitioner said that the doctors had evaluated him but that he had not received the recommended treatment.

The Petitioner testified that he reviewed the terms of his plea agreement with trial counsel at the detention facility two days before his trial was scheduled to begin. The Petitioner said that the terms of the plea agreement included the Petitioner's pleading guilty to an offense for which he was not indicted, specifically that the victim suffered serious bodily injury during the Petitioner's attempted first degree murder. The Petitioner said that at the time of his guilty plea, he did not understand that pleading guilty to an unindicted offense violated his Fifth Amendment constitutional rights. The Petitioner said he never would have pleaded guilty had he known this.

On cross-examination, the Petitioner agreed that he had pleaded guilty to robbery and aggravated assault in 2001, and to aggravated robbery, aggravated burglary, and sexual battery in 2002. The Petitioner said that he was familiar with guilty plea hearings and that he understood the plea process. The Petitioner said that at the time he pleaded guilty, he knew that he risked receiving a lengthy sentence if he proceeded to trial. The Petitioner confirmed that Dr. Kim visited the Petitioner in July 2015 at the detention facility. The Petitioner confirmed that the only reason he pleaded guilty was because the Petitioner believed he would receive specific medical treatment.

-4-

Trial counsel testified that he represented the Petitioner from the preliminary hearing to the resolution of the Petitioner's case. Counsel said that he reviewed the Petitioner's criminal history and that he received the State's notice of intent to seek enhanced punishment because of the Petitioner's prior convictions. Counsel said he believed the Petitioner would likely be classified as a Range III offender if convicted. Counsel said that he was aware of the Petitioner's medical condition regarding his use of anabolic steroids. Counsel explained that he learned of the Petitioner's medical condition from the Petitioner and from the Petitioner's family and that he took a detailed history associated with the Petitioner's steroid use. Counsel said that based on this information, counsel retained Dr. Kim as an expert to evaluate the Petitioner to see if evidence existed of diminished responsibility for the charged crimes. Counsel said that Dr. Kim examined the Petitioner and that counsel thoroughly reviewed Dr. Kim's findings. Counsel said he was concerned that Dr. Kim's primary area of expertise was urology and was unsure if Dr. Kim would be qualified as an expert at trial and be allowed to testify regarding the Petitioner's mental state. Counsel said that he observed the victim's preliminary hearing testimony and believed that her trial testimony would "generate a great deal of sympathy from the jury." Counsel said that the proof of the victim's injuries included her testimony, medical records, and photographs. Counsel said he believed that the jury would find the victim's testimony credible. Counsel said that he met with the Petitioner multiple times and negotiated a guilty plea agreement with the State. Counsel said he discussed with the Petitioner the Petitioner's criminal history and the likely outcome of a trial. Counsel said that he reviewed the plea agreement with the Petitioner multiple times and was confident the Petitioner understood the terms. Counsel said he reviewed the agreement with the Petitioner again the day the Petitioner pleaded guilty. Counsel said it was not his recollection that the Petitioner pleaded guilty because the Petitioner believed he would receive medical treatment related to his steroid use. Counsel thought the Petitioner pleaded guilty because of the possible sentence range and the likely guilty verdict if the Petitioner proceeded to trial. Counsel remembered discussing medical treatment with the Petitioner but said he made no promise the Petitioner would receive medical treatment. Counsel said he explained to the Petitioner that TDOC personnel would assess the Petitioner and determine whether the Petitioner needed medical care.

On cross-examination, trial counsel agreed that the Petitioner had a competency evaluation at the Helen Ross McNabb Center. Counsel said that the center sent his office a request for information that might assist in its evaluation of the Petitioner. Counsel said the Petitioner's evaluation showed that the Petitioner was competent at the time of the offense and competent to stand trial. Counsel agreed that when he sent information to the center, counsel did not provide information related to the Petitioner's prior mental health diagnoses and treatment, nor did he provide information regarding the Petitioner's steroid use. Counsel said that Dr. Kim's evaluation of the Petitioner occurred after the center's competency evaluation and that counsel did not seek to have a forensic expert review Dr. Kim's report.

A transcript and a video recording of Dr. Kim's deposition taken for the purposes of the post-conviction hearing were received as exhibits.

Dr. Edward D. Kim testified that that he was a medical doctor specializing in urology. Dr. Kim said that he had practiced urology since 1995 and had taught residents and medical students since 1995. Dr. Kim said he engaged in research and writing in the medical field, and his specialty training involved male reproductive medicine, specifically focused on testosterone-related health issues. Dr. Kim said he was familiar with anabolic steroid psychosis. When asked why a urologist was better qualified to discuss this mental health issue than a psychiatrist or psychologist, Dr. Kim explained that the underlying disorder was caused by anabolic steroid use. Dr. Kim said that psychosis and behavioral issues were potential side effects of anabolic steroid use. He explained that urologists and endocrinologists specialized in treating anabolic steroid use because the anabolic steroid use also caused significant health issues related to testosterone levels. Dr. Kim said that an anabolic steroid refers to a testosterone-based therapy that increases muscle mass. Dr. Kim said that his research and writing included the study of anabolic steroid psychosis. Dr. Kim said that the psychiatric effects of anabolic steroid use in men were well-documented in the medical community, including studies utilizing MRIs that assessed how anabolic steroids affected brain function. Dr. Kim said that the medical community generally accepted the existence of anabolic steroid psychosis.

Dr. Kim testified that the likely side effects of anabolic steroid use included low testosterone, erectile dysfunction, skin changes, and mood disturbances. Dr. Kim said that the psychiatric side effects of anabolic steroid use included aggression, violence, irritability, and loss of control leading to impulsivity. Dr. Kim explained that the side effects caused a lack of emotional and cognitive regulation. Dr. Kim stated that if an individual had an underlying psychiatric disorder, the use of anabolic steroids could heighten an individual's psychiatric symptoms.

Dr. Kim testified that he knew the Petitioner and had treated the Petitioner for his use of anabolic steroids. Dr. Kim recalled he had seen the Petitioner regarding the Petitioner's anabolic steroid use five times prior to the incident in this case. Dr. Kim recommended that the Petitioner stop using anabolic steroids because the Petitioner had testicular atrophy and problems with testicular function. Dr. Kim said that after the incident in this case, the Petitioner's trial counsel retained Dr. Kim to interview the Petitioner and to provide a summary of the Petitioner's use of anabolic steroids and their possible side effects on the Petitioner's cognition and well-being.

Dr. Kim testified that he was aware of the Petitioner's psychiatric history. Dr. Kim said that during his interview of the Petitioner on July 8, 2015, Dr. Kim learned that the Petitioner had been hospitalized for six months at Lakeshore mental health facility in Knoxville. Dr. Kim said the Petitioner was admitted for "manic depression" and bipolar

disease. Dr. Kim said that after the Petitioner was discharged, the Petitioner received psychiatric care from Dr. Gillespie at Baptist Hospital. Dr. Kim said that the Petitioner's mental health history was important because Dr. Kim opined an individual could enter a "volatile" mental state if the individual had underlying depression and bipolar disease combined with the use of high doses of anabolic steroids.

Dr. Kim testified that through his prior treatment of the Petitioner and his discussions with the Petitioner, Dr. Kim said he had enough information to form specific medical opinions about whether anabolic steroid use affected the Petitioner's mental state at the time of the offense. Dr. Kim said in 2015, he created a report containing these findings and gave it to the Petitioner's trial counsel. Dr. Kim stated that the steroids could have had a "major impact" on the Petitioner's behavior. Dr. Kim explained that in 2013, the Petitioner had been taking high doses of steroids in preparation for a body building competition and that the assault occurred in July 2013. Dr. Kim stated, "Based on the temporal correlation and the high doses of steroids and their duration, with a reasonable degree of medical certainty, one could conclude that [the Petitioner's] use of anabolic steroids affected his behavior." Dr. Kim said that the Petitioner had a loss of impulse control due to the steroid psychosis and that the Petitioner reported having delusions and "constant mania" shortly before the incident. Dr. Kim explained that steroid psychosis would cause the Petitioner to have an altered view of reality and that the Petitioner's symptoms were consistent with steroid psychosis. He said that because of the high levels of testosterone in the Petitioner's body, the Petitioner would not have been able to distinguish between appropriate and inappropriate behavior. Dr. Kim said that had he been called to testify at a trial for the Petitioner, his testimony would be substantially the same as his post-conviction hearing testimony. Dr. Kim's written report prepared after evaluating the Petitioner was received as an exhibit. On cross-examination, Dr. Kim confirmed that he had not done blood work on the Petitioner to confirm that he had taken anabolic steroids at the time of the incident. Dr. Kim said that he did not doubt the Petitioner was taking anabolic steroids based on the physical symptoms Dr. Kim observed.

In a written order, the post-conviction court found that the Petitioner had received the effective assistance of trial counsel and that the Petitioner's guilty plea was knowing and voluntary. The court credited counsel's testimony that the victim would have been a sympathetic witness had she testified at trial and that the Petitioner pleaded guilty to minimize his exposure to a potentially lengthy sentence. The court found that counsel's performance did not fall below an objective standard of reasonableness and entered an order denying relief and dismissing the petition. This appeal followed.

On appeal, the Petitioner contends that the post-conviction court erred by concluding that the Petitioner received the effective assistance of trial counsel and that his guilty plea was knowingly and voluntarily entered. The Petitioner argues that his plea was involuntary and unknowing because counsel did not properly advise the Petitioner about

the Petitioner's sentencing enhancement for inflicting serious bodily injury. The Petitioner also argues that he received the ineffective assistance of counsel because trial counsel did not properly advise the Petitioner regarding the use of Dr. Kim's expert testimony to mitigate the Petitioner's culpability for attempted first degree murder and because counsel promised the Petitioner specific medical treatment in exchange for his guilty plea.

Post-conviction relief is available "when the conviction or sentence is void or voidable because of the abridgement of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103 (2018). A petitioner has the burden of proving his factual allegations by clear and convincing evidence. *Id.* § 40-30-110(f) (2018). A post-conviction court's findings of fact are binding on appeal, and this court must defer to them "unless the evidence in the record preponderates against those findings." *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997); *see Fields v. State*, 40 S.W.3d 450, 456-57 (Tenn. 2001). A post-conviction court's application of law to its factual findings is subject to a de novo standard of review without a presumption of correctness. *Fields*, 40 S.W.3d at 457-58.

To establish a post-conviction claim of the ineffective assistance of counsel in violation of the Sixth Amendment, a petitioner has the burden of proving that (1) counsel's performance was deficient and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993). The Tennessee Supreme Court has applied the *Strickland* standard to an accused's right to counsel under article I, section 9 of the Tennessee Constitution. *See State v. Melson*, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

A petitioner must satisfy both prongs of the *Strickland* test in order to prevail in an ineffective assistance of counsel claim. *Henley*, 960 S.W.2d at 580. "[F]ailure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." *Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996). To establish the performance prong, a petitioner must show that "the advice given, or the services rendered . . . are [not] within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975); *see Strickland*, 466 U.S. at 690. The post-conviction court must determine if these acts or omissions, viewed in light of all of the circumstances, fell "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. A petitioner "is not entitled to the benefit of hindsight, may not second-guess a reasonably based trial strategy by his counsel, and cannot criticize a sound, but unsuccessful, tactical decision." *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *see Pylant v. State*, 263 S.W.3d 854, 874 (Tenn. 2008). This deference, however, only applies "if the choices are informed . . . based upon adequate preparation." *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). To establish the prejudice prong, a petitioner must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*,

466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.*

The Supreme Court has concluded that a guilty plea must represent a "voluntary and intelligent choice among the alternative courses of action open to the defendant." *North Carolina v. Alford*, 400 U.S. 25, 31 (1970). A trial court must examine in detail "the matter with the accused to make sure he has a full understanding of what the plea connotes and of its consequence." *Boykin v. Alabama*, 395 U.S. 238, 243-44 (1969); *see Blankenship v. State*, 858 S.W.2d 897, 904 (Tenn. 1993). Appellate courts examine the totality of circumstances when determining whether a guilty plea was voluntarily and knowingly entered. *State v. Turner*, 919 S.W.2d 346, 353 (Tenn. Crim. App. 1995). A guilty plea is not voluntary if it is the result of "[i]gnorance, incomprehension, coercion, terror, inducements, [or] subtle or blatant threats." *Boykin*, 395 U.S. at 242-43; *see Blankenship*, 858 S.W.2d at 904. A petitioner's representations and statements under oath that his guilty plea is knowing and voluntary create "a formidable barrier in any subsequent collateral proceedings [because] [s]olemn declarations . . . carry a strong presumption of verity." *Blackledge v. Allison*, 431 U.S. 63, 74 (1977).

In the context of a guilty plea, a petitioner claiming ineffective assistance of counsel must prove counsel performed deficiently and "there is a reasonable probability that, but for counsel's errors, [the petitioner] would not have pled guilty and insisted on going to trial." *Hill v. Lockhart*, 474 U.S. 52, 59 (1985); *see also McMann v. Richardson*, 397 U.S. 759, 770-71 (1970). Thus, the primary consideration is whether counsel's deficient performance "affected the outcome of the plea process." *Hill*, 474 U.S. at 59.

In its order denying the Petitioner relief, the post-conviction court found that nothing in the record supported the Petitioner's allegation that the Petitioner's guilty plea was unknowing and involuntary. The court found that the Petitioner was familiar with the criminal justice system because he had previously pleaded guilty to other offenses. The court determined that the Petitioner did not receive the ineffective assistance of counsel because of counsel's failure to pursue a defense related to the Petitioner's use of anabolic steroids. The court reasoned that the Petitioner was not taking steroids at the time of his guilty plea, thus, trial counsel was not deficient. The court determined that the Petitioner also failed to establish prejudice. The court credited counsel's testimony that the victim would have been a "sympathetic and effective" witness. The court also found that the Petitioner knowingly accepted the State's guilty plea offer in order to reduce his risk of being sentenced as a multiple offender with potential consecutive sentencing.

*I.  Sentencing Enhancement*

The Petitioner argues that his guilty plea was not knowing and voluntary because trial counsel did not properly advise the Petitioner about the "serious bodily injury" sentencing enhancement.

As a general principle, "'[s]entencing is jurisdictional and must be executed in compliance with the [applicable Sentencing] Act.'" *Davis v. State*, 313 S.W.3d 751, 759 (Tenn. 2010) (quoting *McConnell v. State*, 12 S.W.3d 795, 798 (Tenn. 2000)).  Our supreme court, however, has concluded that in the context of plea agreements, offender range classification and release eligibility are not jurisdictional. *Davis*, 313 S.W.3d at 760; s*ee Hoover v. State*, 215 S.W.3d 776, 780 (Tenn. 2007) (stating that "a knowing and voluntary guilty plea waives any irregularity as to offender classification or release eligibility"); *see also Hicks v. State*, 945 S.W.2d 706, 709 (Tenn. 1997).  As a result, an agreed upon

> "hybrid" sentence that "mixes and matches" range assignment, term of years, and release eligibility without regard to what our sentencing scheme might call for absent a plea bargain [is valid] so long as (1) the term of years is within the overall range of years specified for the offense . . . and (2) the [release eligibility date] is not less than the minimum allowable for the offense.

*Davis*, 313 S.W.3d at 760.  Specifically, our supreme court has concluded that pursuant to a negotiated plea agreement, a defendant may be sentenced according to a range classification that is greater than a classification based on a defendant's previous convictions. *See State v. Mahler*, 735 S.W.2d 226, 227-28 (Tenn. 1987).  Therefore, "[a] plea-bargained sentence may legally exceed the maximum available in the offender Range so long as the sentence does not exceed the maximum punishment authorized for the plea offense." *Hoover*, 215 S.W.3d at 780.

The terms of the plea agreement required the Petitioner to plead guilty to attempted first degree murder during which the victim suffered serious bodily injury.  The "serious bodily injury" sentencing enhancement was not included in the Petitioner's indictment, but the Petitioner stated that he understood this and agreed to this plea agreement term.  At the post-conviction hearing, the parties and the trial court mistakenly thought that the "serious bodily injury" sentencing enhancement was not in effect at the time of the Petitioner's offense.  However, if a defendant is found guilty of attempted first degree murder and "the victim suffers serious bodily injury," the defendant is not eligible for release until the defendant has served eighty-five percent of the sentence. *See* T.C.A. § 40-35-501(k)(5).  This provision went into effect on July 1, 2013. *See id.*  Thus, the "serious bodily injury" sentencing enhancement was in effect at the time of the Petitioner's July 13, 2013 offense.

This sentencing enhancement was discussed at the guilty plea hearing, and the record supports the court's finding that the Petitioner understood that he was pleading guilty to an unindicted sentencing enhancement. The Petitioner is not entitled to relief regarding this issue.

## II.      Expert Testimony

The Petitioner argues that his plea was not knowing and voluntary because he received the ineffective assistance of counsel by trial counsel's failing to utilize Dr. Kim's testimony at trial.

The post-conviction court failed to address the Petitioner's claim of ineffective assistance of counsel regarding expert testimony specified in the Petitioner's petition for post-conviction relief. The Petitioner argued that trial counsel was ineffective for failing to make use of Dr. Kim's testimony regarding the Petitioner's mental state. The court reasoned that the Petitioner was not taking steroids at the time the guilty plea was entered. However, this is not relevant for determining whether the Petitioner received the ineffective assistance of counsel by counsel's failure to utilize Dr. Kim's testimony and report regarding the effects of steroids on the Petitioner's mental state *at the time of the offense*. We remand the case for further findings regarding this issue.

## III.      Medical Treatment

The Petitioner argues that his plea was not knowing and voluntary because he received the ineffective assistance of counsel by trial counsel's promising the Petitioner he would receive specific medical treatment while in TDOC custody.

The post-conviction court has failed to address the Petitioner's claim of ineffective assistance of counsel regarding medical treatment specified in the Petitioner's petition for post-conviction relief. The Petitioner argued that his guilty plea was not knowingly entered because it was induced by trial counsel's promises that the Petitioner would receive medical treatment related to his steroid use. The Petitioner testified that but for counsel's promises of medical treatment, the Petitioner would not have pleaded guilty. Counsel testified that he made no such promises to the Petitioner. However, the court did not make a finding regarding medical treatment and failed to address whether the Petitioner was induced by counsel to plead guilty in exchange for medical treatment related to his steroid use. We remand the case for further findings regarding this issue.

We affirm the post-conviction court's finding that the Petitioner understood he was pleading guilty to an unindicted sentencing enhancement. However, the post-conviction court did not meet the requirements of Tennessee Code Annotated section 40-30-111(b) when it failed to state its findings of fact and conclusions of law with regard to the

Petitioner's other grounds for relief. The "absence of findings of fact and conclusions as to all issues prevents this court from discharging its duties of appellate review." *Darrell A. Cooper v. State*, No. E2019-02132-CCA-R3-PC, 2020 WL 6112987, at *7 (Tenn. Crim. App. Oct. 16, 2020) (remanding case because the post-conviction court failed to make any findings of fact and conclusions of law with respect to the issues raised). Thus, the judgment of the post-conviction court is reversed in part, and this case is remanded for findings of fact and conclusions of law regarding the Petitioner's claims that trial counsel was ineffective for failing to utilize Dr. Kim's report regarding the effects of steroid use on the Petitioner's mental state at the time of the offense and that the Petitioner was induced to plead guilty based on counsel's promise the Petitioner would receive specific medical care while in TDOC custody.

_____
ROBERT H. MONTGOMERY, JR., JUDGE